Filed 3/14/25  Raja Development Co. v. Napa Sanitation District CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| RAJA DEVELOPMENT CO. INC. et al.,<br><br>        Plaintiffs and Appellants,<br><br>v.<br><br>NAPA SANITATION DISTRICT,<br><br>        Defendant and Respondent;<br><br>COUNTY OF NAPA,<br><br>        Real Party in Interest. | A170777<br><br>(Napa County Super. Ct. No. 19CV000682) |

Plaintiffs Raja Development Co., Inc., Cashel, Inc., and Carter Randall Callahan (plaintiffs) appeal an order denying their motion for attorney fees under Code of Civil Procedure section 1021.5.[1]  We find no error and affirm.

### BACKGROUND

In May 2019, plaintiffs filed the present action seeking a refund of sewer service charges that they, as condominium owners, paid to the Napa Sanitation District (the District).  They

___

[1] All undesignated statutory references are to the Code of Civil Procedure.

also sought to enjoin further collection of those charges.[2]  As amended, their complaint alleged, among other things, that the sewer service charge included a use fee for general operations, general revenue purposes, and other non-capacity related purposes, and that this fee was "an invalid tax because it exceeds the reasonable cost of providing the service for which it is charged, the District has not justified the fee with a nexus study, and the fee has not been approved by two-thirds of voters." (*Raja Development Co. v. Napa Sanitary Dist.* (2022) 85 Cal.App.5th 85, 91.)  Specifically, plaintiffs alleged that the use fee was improperly calculated for townhomes and condominiums at the same rate that was used to calculate the charges for single family homes, rather than at the lesser rate charged for apartments, and that the District had not justified the higher charges with a rate study showing that the charges were limited to the cost of providing the associated services as required by law.  The operative complaint omitted the cause of action seeking refunds of the amounts that plaintiffs alleged had been illegally collected because the court had previously sustained a demurrer to that cause of action without leave to amend.

On October 31, 2023, the District moved for judgment on the pleadings on the ground that plaintiffs' claim was moot because the ordinance challenged in the lawsuit was no longer in effect.  The District explained that the sewer service charges

---

[2] The operative complaint names the District (erroneously referred to as the Napa Sanitary District) as the defendant but identifies Napa County as the real party in interest.

challenged in the litigation were imposed under the authority of Ordinance 87, and that Ordinance 87 was superseded by Ordinance 112, which was adopted by the District's Board of Directors on March 31, 2021 and took effect on July 1, 2021. The motion further explained: "Ordinance 112 changed the rate structure for the sewer service charges at issue based on a rate study conducted in 2020. The District periodically commissions such rate studies to ensure that sewer service charges properly align with costs; revisiting the rates at this time was especially appropriate given the fluctuating water demands due to the COVID-19 pandemic. The Rate Study analyzed, *inter alia*, the cost of providing services to various types of dwellings—including townhomes and condominiums—and the appropriate nexus between these costs and the corresponding rates and fees charged to customers. It determined that the [Equivalent Dwelling Unit] ratios for townhomes and condominiums, as well as certain other residential properties, should be adjusted over a five year period.[3] Ordinance 112 reflects these recommendations, and, accordingly, the sewer service charges for condominiums and townhomes are no longer set at [the rates alleged in the complaint]." Plaintiffs did not dispute that its claims were moot but argued that a judgment should be entered in their favor since

---

[3] An Equivalent Dwelling Unit is a measure defined under Section 1.02.010 of the Napa Sanitation District Code as "the combination of flow and strength of wastestream that is equivalent to the waste discharged from a single family home. This is often evaluated on a per day basis."

the District had "taken all actions demanded in the []
Complaint." The trial court disagreed and granted the motion.

On February 29, 2024, plaintiffs filed a motion seeking
approximately $700,000 in attorney fees under section 1021.5.
They claimed that, despite the fact that there was no judgment in
their favor, their lawsuit was "CLEARLY the catalyst for the
actions taken by the District" because the changes demanded by
plaintiffs were "made by the District in the middle of this
litigation." The District opposed the motion, claiming that its
decision to conduct a rate study and later to change its rate
structure was motivated not by plaintiffs' lawsuit but by a
separate administrative appeal brought by another entity
in 2016. The District argued further that even if plaintiffs had
established an entitlement to attorney fees, the amount of fees
claimed was not reasonable.

The trial court denied the motion, finding that it was
procedurally and substantively deficient.

## DISCUSSION

"The Legislature adopted Code of Civil Procedure
section 1021.5, a codification of the private attorney general
doctrine, as an exception to the general rule that litigants are to
bear their own attorney fees. [Citation.] ' "[T]he private attorney
general doctrine 'rests upon the recognition that privately
initiated lawsuits are often essential to the effectuation of the
fundamental public policies embodied in constitutional or
statutory provisions, and that, without some mechanism
authorizing the award of attorney fees, private actions to enforce

4

such important public policies will as a practical matter frequently be infeasible.' " ' [Citation.] The fundamental purpose of the doctrine is to encourage suits enforcing important public policies by rewarding attorneys who successfully prosecute such cases and prevent worthy claimants from being silenced or stifled by a lack of legal resources." (*Department of Water Resources Environmental Impact Cases* (2022) 79 Cal.App.5th 556, 570–571 (*Environmental Impact Cases*).)

To qualify for fees under section 1021.5, a plaintiff must show, among other things, that it is a successful party. (*Environmental Impact Cases*, *supra*, 79 Cal.App.5th at p. 571.) "Our Supreme Court has taken a 'broad, pragmatic' view of what constitutes a successful party for purposes of Code of Civil Procedure section 1021.5. [Citation.] The trial court ' " 'must realistically assess the litigation and determine, from a practical perspective, whether or not the action served to vindicate an important right so as to justify an attorney fee award' under [Code of Civil Procedure] section 1021.5." ' [Citation.] [¶] It is not necessary for a plaintiff to obtain a judgment in its favor to qualify as a successful party. [Citation.] In *Graham* [*v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 560–561, 568 (*Graham*)], our Supreme Court endorsed the 'catalyst theory' of attorney fees, under which plaintiffs may be considered successful if their lawsuit caused the defendant to voluntarily provide the relief sought. [Citation.] Under the catalyst theory, attorney fees may be awarded even when litigation does not result in a judicial resolution if the defendant voluntarily changes

its behavior substantially because of, and in the manner sought by, the litigation." (*Environmental Impact Cases*, *supra*, at p. 571.)

A plaintiff moving for attorney fees under the catalyst theory "must establish that (1) its 'lawsuit was a catalyst motivating the defendants to provide the primary relief sought'; (2) 'the lawsuit had merit and achieved its catalytic effect by threat of victory, not by dint of nuisance and threat of expense'; and (3) it 'reasonably attempted to settle the litigation prior to filing the lawsuit.'" (*Environmental Impact Cases*, *supra*, 79 Cal.App.5th at pp. 571–572.) "To satisfy the first (causation) prong, the plaintiff need not show the litigation was the only cause of defendant's acquiescence. [Citation.] The litigation need only be a ' "substantial factor" ' contributing to the relief obtained." (*Id.* at p. 572.)

We review a trial court's determination of whether a litigant is a successful party under the catalyst theory party for abuse of discretion. (*Environmental Impact Cases, supra*, 79 Cal.App.5th at p. 573.) "To determine whether the trial court abused its discretion, we must review the entire record, paying particular attention to the court's stated reasons and whether it applied the proper standards of law in reaching its decision. [Citation.] ' "We accept the trial court's resolution of credibility and conflicting substantial evidence, and its choice of possible reasonable inferences that can be drawn from the evidence." ' " (*Ibid.*)

6

Here, the trial court found that: (1) plaintiffs failed to show that they engaged in any attempts, let alone reasonable attempts, to settle the litigation prior to filing the lawsuit; (2) plaintiffs provided only "conclusory argument that Ordinance 112 achieves the relief that was demanded by plaintiffs" but presented no evidence, by declaration or request for judicial notice, "to show what their primary litigation objective was and what action Defendants allegedly took to achieve those objectives;" (3) plaintiffs failed to establish that their lawsuit was the catalyst motivating the defendants to provide the primary relief sought; and (4) plaintiffs failed to establish that the lawsuit was meritorious and that they achieved the catalytic effect by threat of victory, not by dint of nuisance and threat of expense.

Initially, we agree with the trial court's characterization of plaintiffs' moving papers as procedurally deficient and their argument as conclusory. On appeal, plaintiffs argue that the trial court raised their failure to address prelitigation settlement sua sponte, and they argue that the allegations in their complaint that they met with the staff of the District and detailed the issues that would later be raised in the complaint were sufficient to meet this requirement. But it is the burden of the moving party to ensure that the moving papers support each element required for relief. (*City of Maywood v. Los Angeles Unified School Dist.* (2012) 208 Cal.App.4th 362, 429 [a party moving for an attorney fees award must establish each element for such an award in order for their motion to be granted].) This they did not do.

7

Similarly, plaintiffs' conclusory statements that the adoption of Ordinance 112 necessarily proves the prior charges were illegal and that the District conceded or admitted as much through or by their actions is not sufficient to meet their burden as the moving party. However, we need not rely on these additional grounds to affirm the trial court's order because, as discussed below, the record establishes that the court did not abuse its discretion in concluding that plaintiffs' lawsuit was not a catalyst for the District's decision to conduct the 2020 rate study or enact Ordinance 112.

On appeal, plaintiffs again rely solely on the chronology of events to support their argument that the lawsuit was the catalyst for the actions taken by the District. They argue: "Plaintiffs' Action sought 1) to compel the District either [to] conduct a nexus study for the sewer fees charge or to put the fee/tax on the ballot for approval, and 2) to adopt a fee for townhomes and condominiums that is accurate and separate and apart from the fee charged for single family residences. The District had refused to take these actions for 44 years before the Action was filed. Two years after the action was filed, the District, for the very first time conducted the required nexus study and establishing a separate fee for townhomes and condominiums. Following the unprecedented study of rates for townhomes and condominiums, the District then satisfied the second demand of Plaintiffs by adopting a separate fee for townhomes and condominiums which is lower than the fee charged to single-family residences. The District, through these

8

actions, conceded that all of the allegations in the Third Amended Complaint were true and corrected their illegal actions, for the first time in almost half a century because of this action."

This chronology of events was initially sufficient to raise an inference that plaintiffs' lawsuit motivated the District's actions. As the court explained in *Environmental Impact Cases, supra*, 79 Cal.App.5th at pages 572–573, "[b]ecause defendants usually are reluctant to concede that litigation induced them to provide the relief sought, '[c]lues to the provocative effects of the plaintiffs' legal efforts are often best gleaned from the chronology of events . . . .' [Citations.] 'When, after litigation is initiated, a defendant has voluntarily provided the relief a plaintiff is seeking, the chronology of events may raise an inference that the litigation was the catalyst for the relief.' [Citations.] This shifts to the defendant the burden to produce evidence to rebut that inference. [Citation.] The ultimate burden of proof, however, remains on the claimant to establish each element of the statute." (See also *Graham, supra*, 34 Cal.4th at p. 573 [defendant "knows better than anyone why it made the decision that granted the plaintiff the relief sought, and the defendant is in the best position to either concede that the plaintiff was a catalyst or to document why the plaintiff was not"]; *Californians for Responsible Toxics Management v. Kizer* (1989) 211 Cal.App.3d 961, 969 [credible evidence submitted by defendant may "suffice to rebut the presumption of causation raised solely by the chronology of events"].)

Here, the District submitted a declaration by its General Manager, who explained that he served as the District's Senior Civil Engineer / Capital Projects Manager from April 2013 to August 2016 and as Technical Services Director from August 2016 to April 2023, and that in those roles he was responsible for reviewing the District's annual sewer service charges. His declaration asserts that the District's 2020 rate study and the subsequent changes enacted by Ordinance 112 were motivated by an assessment appeal filed in 2016 by the management company operating the Oaktree Vineyard Mobile Home Park (Oaktree Vineyard) and that "neither the 2020 rate study nor Ordinance 112 were influenced by this lawsuit." The declaration sets out in significant detail and with supporting documentary evidence the following history of the 2016 Oak Vineyard appeal and how it motivated the District to adjust its sewer charges: In April 2016, Oaktree Vineyard applied for review of a determination by the District that the manufactured homes at Oaktree Vineyard did not qualify as mobile homes under state statutes and thus, that they should be assessed fees at the same rate as single family homes and not mobile homes. The declarant states that he reviewed this application as part of his job duties and, based on his review of Oaktree Vineyard's water usage, "determined that Oaktree Vineyard's water usage was more akin to the water usage for mobile homes in the area than it was to the water usage for single family homes." In July 2016, based on the declarant's report and testimony, the

10

District approved the application and reduced Oaktree Vineyard's sewer service charges.

The declaration continues:  "Because the Oaktree Vineyard appeal revealed a discrepancy between water usage and wastewater generation on the one hand, and residential unit classification and sewer service charges on the other hand, with respect to the homes at issue in that appeal, I recommended to [the District's] management shortly after the appeal that [it] conduct a further study of water usage and wastewater generation from different types of residential and commercial unit types, to assess whether other such discrepancies existed."  The District's management agreed with his recommendation and "determined that [the District] should broaden its next cost of service analysis to include consideration of a wider range of residential and commercial unit types, to study the alignment of water usage and wastewater generation with residential and commercial unit classification and charges in the most economical manner."

According to the declaration, the District conducts rate studies every five years and the next rate study was scheduled to take place in 2020.  The declarant explained, "we planned to include wider range of residential and commercial unit types in the 2020 rate study" but did not "plan for a rate study to be done outside the regular schedule, in part because conducting a rate study requires a process to select an appropriate vendor and requires budgeting time and money to complete the analysis (including a fair amount of staff time).  Because we had recently

11

finished a rate study and had another planned to take place in about three years, and because the expanded analysis we planned would be complex and would take time to develop, I believed and [the District's] management determined in the course of our discussions in 2016 that it would be more efficient to add these expanded issues to the 2020 rate study rather than trying to put together budget and proposal for a study prior to that time. [¶] When it came time for the Board to commission the 2020 rate study, . . . we recommended that the rate study include a wider variety of residential and commercial unit types than those typically included in [the District's] cost of service analyses. The Board accepted this recommendation, and on March 4, 2020, the Board approved a consultant contract for the 2020 rate study."

The 2020 rate study "analyzed the cost of providing services to various types of residential and commercial unit types and the appropriate nexus between these costs and the corresponding rates and fees charged to customers" and "concluded that the [] ratios for certain residential properties should be adjusted over a five-year period." On March 31, 2021, the District adopted Ordinance 112, which amended applicable provisions of the municipal code "to change the rate structure for certain residential properties as recommended by the 2020 rate study." The declarant concludes that "[t]he changes the Board made to residential sewer service charges would have occurred regardless of this lawsuit, in my opinion, because through my involvement in [the District's] assessment of the [Oaktree Vineyard appeal]

12

and in [the District's] subsequent discussions and determinations about the scope of the 2020 rate study, and as one of the persons responsible for that study, I am aware that [the District] had already put these changes into motion beginning in 2016."

The trial court reasonably concluded that any inference that plaintiffs' litigation was the catalyst for the District's actions based on the chronology of events was rebutted by the District's evidence submitted in opposition to the motion. Plaintiffs' arguments to the contrary are not persuasive.

On appeal, plaintiffs repeat, almost verbatim, their argument in the trial court that the declaration was inadmissible because "the legislative thought process privilege prohibits staff statements regarding the intent of the legislative body." They cite *Regents of Univ. of California v. Superior Court* (1990) 20 Cal.4th 509, 540, in which the court held that "[u]nder the deliberative thought process privilege, senior officials of all three branches of government enjoy a qualified, limited privilege not to disclose or be examined concerning not only the mental processes by which a given decision was reached, but the substance of conversations, discussions, debates, deliberations and like material reflecting advice, opinions, and recommendations by which government policy is processed and formulated." The trial court, however, overruled plaintiffs' objection on the ground that, because the District is the holder of the deliberative process privilege, its "decision to include evidence of their motivation behind adopting Ordinance 112 is better classified as a waiver of that privilege, rather than a violation of the privilege."

13

Plaintiffs have made no attempt to challenge the trial court's conclusion or explain why the general rule that the "holder of the privilege" is the person entitled to claim or waive it does not apply. The issue has therefore been forfeited. (*Telish v. State Personnel Bd.* (2015) 234 Cal.App.4th 1479, 1487, fn. 4.) In any event, the trial court was correct. (See, e.g., Evid. Code, § 912 ["the right of any person to claim a privilege . . . is waived with respect to a communication protected by the privilege if any holder of the privilege, without coercion, has disclosed a significant part of the communication or has consented to disclosure made by anyone"]; *Citizens for Open Government v. City of Lodi* (2012) 205 Cal.App.4th 296, 306 ["The burden is on the [one claiming the deliberative process privilege] to establish the conditions for creation of the privilege"].)

Plaintiffs also argue summarily that the "only purpose of the [] Declaration is to establish the motives and intent of the Napa Sanitation District in adopting Ordinance 112" and that "[n]o one can truly know the intent of those voting except from statement made from the dais by those voting." The declaration, however, provides credible evidence as to the events that led to the District's actions as set forth by a direct participant in the process. Plaintiffs do not suggest that the declaration lacked credibility. Nor do they argue that the declaration was insufficient to establish that the specific issue raised by their lawsuit—whether water usage for condominiums was more similar to single family homes or apartments—was considered in the 2020 rate study as a result of the Oaktree Vineyard appeal

14

and not their litigation.  Rather, they suggest that despite this evidence individual members of the District's Board may have voted in favor of the new ordinance for the undisclosed reason that they were motivated by plaintiffs' pending litigation. Plaintiffs' argument is entirely speculative and insufficient to establish that the trial court abused its discretion in relying on the declaration to conclude that plaintiffs were not a successful party for purposes of awarding attorney fees.

## DISPOSITION

The order denying plaintiffs' motion for attorney fees is affirmed.  The District is entitled to recover its costs on appeal.

GOLDMAN, J.

WE CONCUR:

BROWN, P. J.
STREETER, J.

15